1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   JOHNAE HOYT                          Case No.:  3:19-cv-1553-L-AHG
     CDCR #K67211,
12                                        **ORDER GRANTING IN PART AND**
                              Plaintiff,   **DENYING IN PART DEFENDANTS'**
13                                        **MOTION FOR SUMMARY**
                  vs.                     **JUDGMENT FOR FAILURE**
14                                        **TO EXHAUST PURSUANT**
                                          **TO 42 U.S.C. § 1997e(a)**
15                                        **[ECF No. 35]**
     GEORGE VALDOVINOS, et. al.,
16
                              Defendants.
17

18

19

20        Johnae Hoyt ("Plaintiff") is currently incarcerated at R. J. Donovan Correctional

21   Facility located in San Diego, California, and is represented by counsel in this civil action

22   pursuant to 42 U.S.C. § 1983.

23   **I.      Procedural Background**

24        Plaintiff initially filed his civil rights Complaint pursuant to 42 U.S.C. § 1983 on

25   August 16, 2019, quickly followed by an Amended Complaint on September 6, 2019, and

26   a Third Amended Complaint ("TAC") on October 7, 2019. (ECF Nos. 1, 5, 11, 12.) Hoyt

27   did not prepay the civil filing fee required to commence a civil action at the time he filed

28

                                            1

his Complaint; instead, he filed a Motion for Leave to proceed In Forma Pauperis ("IFP") pursuant to 28 U.S.C. § 1915(a) (ECF No. 2).

On August 27, 2019, this Court granted Hoyt's Motion to Proceed IFP pursuant to 28 U.S.C. § 1915(g). (ECF No. 3). On November 6, 2019, the Court reviewed Hoyt's Third Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A and directed U.S. Marshal service pursuant to 28 U.S.C. § 1915(d) and FED. R. CIV. P. 4(c)(3) as to Defendants[1] who are alleged to have violated Plaintiff's First and Eighth Amendment rights. (*See* ECF No. 13.)

On December 20, 2019, Defendants V. Cortes, R. Olivarria, L. Godinez, T. McWay, S. Beyer, G. Valdovinos, J. McGee, S. Lizarraga, C. Frandsal, M. Rico, D. Paramo, C. Covel, D. Ramos, J. Elgar, K. Withers, K. Miller, and E. Cruz, filed a motion seeking summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies before filing suit pursuant to 42 U.S.C. § 1997e(a). (ECF No. 35.). The Court has notified Plaintiff of the requirements for opposing summary judgment pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) (ECF No. 37). Plaintiff filed his Opposition on March 20, 2020 and Defendants filed their Reply on April 3, 2020. (*See* ECF Nos. 49, 51.)

## II.   Plaintiff's Allegations

### B.   Factual Allegations

Hoyt was an inmate at Richard J. Donovan State Prison at all relevant times. Hoyt received a Loss of Privilege (LOP) that included loss of yard time, but contends he was allowed to participate in his Enhanced Outpatient (EOP) group. (TAC, Doc. No. 12 at 3.) On April 23, 2017, Hoyt attempted to enter the prison yard to participate in an EOP group, but Defendants Valdovinos and Cruz confronted him and told him to leave. (*Id.*) Hoyt tried to show Valdovinos and Cruz the group list to establish that he had the right to

---

[1] All named Defendants are prison officials at the Richard J. Donovan Correctional Facility ("RJD") where Plaintiff was housed at the time the alleged actions giving rise to this matter occurred.

be in the yard for EOP, but the officers insisted he leave the yard.  (*Id.*) Hoyt went to the supervisor, Defendant Ramos, and asked her to tell Valdovinos and Cruz that he was allowed to be in the yard for EOP.  (*Id.*)  Ramos allegedly told Hoyt "You heard them! Get back inside!"  (*Id.* at 4). Correctional Officer K. Miller was in the tower observing the situation as it unfolded.  (*Id.* at 4).

Hoyt went inside and asked the floor officers, McWay and Lizarraga, to call the Lieutenant to clarify that Hoyt was allowed to be in the yard for EOP.  (*Id.*) Hoyt contends there were many inmates in the area who witnessed what followed.  (*Id.*)  As Hoyt was speaking with the floor officers, Valdovinos, Cruz and Ramos came in and stood around Hoyt.  (*Id.*)  Officers Valdovinos, Cruz and Ramos told Hoyt to "Take it back to your cell!" (*Id.*)  Hoyt responded that he was talking to the floor officers, who had the authority to order him back to his cell, when the situation escalated into a confrontation with Valdovinos.  Hoyt reportedly told Valdovinos, "You were at the hearing" and pointed to Valdovinos when he said "you."  (*Id.*)

Valdovinos then pepper-sprayed Hoyt while yelling, "Get down! Get down! Get down!"  (*Id.* at 5).  Hoyt backed up into the view of two psychiatric technicians, Defendants Elgar and Withers, and got down into the prone position with his hands behind his back and his legs up with his ankles crossed.  (*Id.*)  Cruz allegedly sprayed Hoyt with pepper spray on the back of his head, sides of his head, down his back and legs.  (*Id.*) A pool of pepper spray formed beneath and around Hoyt, forcing him to keep his head off the ground to avoid the spray.  (*Id.*)  Hoyt states that Valdovinos and Cruz then placed him in handcuffs and leg shackles.  (*Id.*)  As Valdovinos was standing up after handcuffing and shackling Hoyt, he slipped in the pool of pepper-spray and fell. (*Id.*) The inmates in the room reportedly laughed and mocked Valdovinos, and Hoyt laughed along with them.  (*Id*).

Valdovinos got angry and dropped his body weight of over 220 pounds on Hoyt by kneeing him in the back of the head.  (*Id.*)  Hoyt's face was forced into the concrete floor,

knocking out his four front teeth: one broke off below the gum line and came out, the other three broke above the gum line and required surgery to remove.  (*Id*. at 6).  Hoyt lost consciousness, and when he awoke a brief time later, he asked officer Valencia who helped him up, who had knocked out his teeth.  (*Id*.)  Valdovinos allegedly yelled, "I did, motherfucker! That is what you get for running your mouth!" (*Id*.)

Officer Valencia took Hoyt outside for some air, and while he was outside, he believes Officers McWay and Lizarraga made an inmate sweep up Hoyt's tooth and mop up the blood. (*Id*.) No report was written about the clean-up according to Hoyt.  (*Id*.) Valencia then took Hoyt to the "C" gym facility holding cage where Defendant Elgar examined him and failed to document any significant injuries in his medical report.  (*Id*.) Hoyt was then moved to an infirmary holding tank, where he asked Defendants McGee and Ramos how to file an excessive force complaint.  (*Id*. at 7).  Hoyt claims that McGee and Ramos told him that if he filed an excessive force complaint, they would have multiple correctional officers say they saw Hoyt attack Valdovinos, and they would put Hoyt in administrative segregation.  (*Id*.)

Although the facility had Dr. Frandsal and RN Garcia on staff, Hoyt did not receive medical attention for five hours. (*Id*.) When RN Garcia and Dr. Maletz saw Hoyt, they gave him 800 mg ibuprofen but failed to give him anything with which to clean and disinfect his mouth.  (*Id*.)

Hoyt alleges that Defendants Valdovinos, McWay, Miller, Lizarraga, and Cruz, all wrote false reports stating that he had assaulted a peace officer, and that he was not seriously injured.  (*Id*.) Defendants Ramos and McGee purportedly put Hoyt in administrative segregation later that day and filed a "Battery on a Peace Officer" charge against him.   Ramos allegedly told Hoyt that if he wanted the battery charges to go away, he would need to say that Valdovinos' attack on Hoyt was an accident. (*Id*. 7-8).

That evening, Hoyt was interviewed as part of the excessive force claim with Defendant Ramos operating the camera, a violation of policy because Ramos was present

during the incident.  (*Id*. at 8).  Before the video started recording, Ramos allegedly asked Hoyt, "it was an accident, wasn't it?"  (*Id*.)  Hoyt asserts that due to Ramos and McGee's threats and coercion, he stated on camera that Valdovinos knocking him to the floor and breaking his teeth was an accident.  (*Id*.)  The Battery on a Peace Officer charges were dropped the next day, April 24, 2017 and Hoyt was then let out of ad seg.  (*Id*.)

 Hoyt saw a dentist who removed the broken teeth, some roots and bone.  (*Id*.) Plaintiff was on all liquid diet for five days and could not chew for three to four weeks. (*Id*.)  During this time, Plaintiff filed an excessive force complaint and gathered over thirty witnesses.  (*Id*.) Two to three times a week from April 23, 2017 until July 13, 2017, Hoyt claims that Valdovinos and Ramos threatened to retaliate against him if he did not drop his excessive force complaint.  (*Id*. at 9.)  Defendant Godinez threatened Hoyt into dropping the complaint at least once.  (*Id*.)  Each time he was threatened, he told his psychologist, Dr. Crystal Adibe, and she reported at least two of those incidents to her supervisor Dr. Sarah Beyer.  (*Id*.) Plaintiff alleges that Dr. Beyer told Dr. Adibe to stop reporting Plaintiff's complaints.  (*Id*.)

On May 7, 2017, Hoyt was issued a rules violation report (RVR) for "behavior that could lead to violence." (*Id*.) In response, Hoyt asked his presiding officer, Defendant Cortes, that he be able to call witnesses and have an investigative employee to help obtain the names of witnesses due to his housing restrictions.  (*Id*.)  Plaintiff states that his requests to call witnesses and have the assistance of an investigative employee were denied, which Hoyt contends was in retaliation for his excessive-force claim.  (*Id*. at 10). Hoyt also claims that Sergeant Rico was in charge of investigating his excessive force claim but refused to let him call witnesses, and omitted witnesses from his requested witness list.  (*Id*. at 11.)  On May 24, 2017, Defendant Cortez found Hoyt guilty of the rules violation.  (*Id*. at 10.)  Hoyt appealed the decision regarding the calling of witnesses, and the verdict was overturned, but the rules violation has not yet been reheard.  (*Id*.)

Hoyt states that Warden Paramo failed to supervise Defendants and that his correctional administrator, Defendant Covel, failed to investigate the excessive-force complaint, and acted to cover it up.  (*Id*. 10-11.) Plaintiff alleges that Defendants Olivarria and Self, along with Defendant Hunnicut, delayed the decision on his excessive-force complaint in retaliation for its filing.  (*Id*. at 11.)

## II. Defendants' Motion

Defendants seek summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a) before filing suit. (*See* Defs.' P&As in Supp. of Summ. J. [P&As] (ECF No. 42) at 11-12.)

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment if the movant shows that there is no genuine dispute as to any material fact. Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c)(1).

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*See C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).[2]

---

[2]      Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from all quotations.

On the other hand, if the moving party would not bear the burden at trial, it can meet its burden on summary judgment by "either of two methods." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). It may

> produce affirmative evidence . . . negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may . . . meet its initial burden of production "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."

*Id.* at 1105-06 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).[3] "A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins.,* 210 F.3d at 1105.

> If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.

*Id.* at 1102-03; *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins.,* 210 F.3d at 1103. In this regard, the nonmoving party must "go beyond the pleadings and by

---

[3]     As an example of the latter method, in *Celotex* it was sufficient

> for Celotex to direct the district court's attention to Catrett's answer to interrogatories admitting that she had no witnesses who could testify that her husband had been exposed during the statutory period to asbestos manufactured by Celotex, and to the absence of any other evidence of exposure in the materials compiled during discovery.

*Nissan Fire & Marine Ins. Co.,* 210 F.3d at 1105.

7

[its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  The nonmoving party

> must do more than simply show that there is some metaphysical doubt as to the material facts[, but] must come forward with specific facts showing that there is a genuine dispute for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . .. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"[I]f the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."  *Nissan Fire & Marine Ins.,* 210 F.3d at 1103.  If it does not produce enough evidence, then the moving party wins the motion for summary judgment.  *Id.*

## B. <u>Legal Standards for Exhausting Administrative Remedi</u>

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)). "There is no question that exhaustion is mandatory under the PLRA[.]" *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citation omitted). The PLRA also requires that prisoners, when grieving their appeal, adhere to CDCR's "critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 91 (2006). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

The exhaustion requirement is based on the important policy concern that prison

officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204. The "exhaustion requirement does not allow a prisoner to file a complaint addressing non-exhausted claims." *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

Therefore, regardless of the relief sought, a prisoner must pursue an appeal through all levels of a prison's grievance process as long as that process remains available to him. "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies ... available,' and the prisoner need not further pursue the grievance." *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) (original emphasis) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross*, 136 S. Ct. at 1862; *see also Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010) (PLRA does not require exhaustion when circumstances render administrative remedies "effectively unavailable.").

Grievance procedures are available if they are "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738); *see also Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) ("To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'") (quoting *Albino v. Baca*, 747 F.3d 1162, 1171(9th Cir. 2014)).

Because the failure to exhaust is an affirmative defense, Defendants bear the burden of raising it and proving its absence. *Jones*, 549 U.S. at 216; *Albino*, 747 F.3d at 1169 (noting that Defendants must "present probative evidence—in the words of *Jones*, to 'plead and prove'–that the prisoner has failed to exhaust available administrative remedies under § 1997e(a)"). Defendants must produce evidence proving the Plaintiff's failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable Plaintiff, shows he failed to

exhaust. *Id.*

## B. <u>CDCR's Exhaustion Requirements</u>

The California Department of Corrections and Rehabilitation (CDCR) has a procedure by which a prisoner may appeal "any policy, decision, action, condition, or omission by the department or its staff that [he] can demonstrate as having a material adverse effect upon his ... health, safety, or welfare." CAL CODE REGS., tit. 15 § 3084.1(a). Since January 28, 2011, and during the times alleged in Plaintiff's TAC, Title 15 of the California Code of Regulations requires three formal levels of appeal review. Thus, in order to properly exhaust, a California prisoner must, within 30 calendar days of the decision or action being appealed, or "upon first having knowledge of the action or decision being appealed," CAL. CODE REGS., tit. 15 § 3084.8(b), "use a CDCR Form 602 (Rev. 08/09), Inmate/Parolee Appeal, to describe the specific issue under appeal and the relief requested." *Id.* § 3084.2(a). The CDCR Form 602 "shall be submitted to the appeals coordinator at the institution." *Id.* § 3084.2(c), § 3084.7(a). If the first level CDCR Form 602 appeal is "denied or not otherwise resolved to the appellant's satisfaction at the first level," *id.* § 3084.7(b), the prisoner must "within 30 calendar days ... upon receiving [the] unsatisfactory departmental response," *id.* § 3084.8(b)(3), seek a second level of administrative review, which is "conducted by the hiring authority or designee at a level no lower than Chief Deputy Warden, Deputy Regional Parole Administrator, or the equivalent." *Id.* § 3084.7(b), (d)(2). "The third level is for review of appeals not resolved at the second level." *Id.* § 3084.7(c). "The third level review constitutes the decision of the Secretary of the CDCR on an appeal and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent. The third level of review exhausts administrative remedies," *id.* § 3084.7(d)(3), "unless otherwise stated."[4] *Id.* § 3084.1(b); *see also* CDCR OPERATIONS

---

[4] For example, "[a] second level of review shall constitute the department's final action on appeals of disciplinary actions classified as 'administrative' as described in section 3314, or minor disciplinary

MANUAL § 541100.13 ("Because the appeal process provides for a systematic review of inmate and parolee grievances and is intended to afford a remedy at each level of review, administrative remedies shall not be considered exhausted until each required level of review has been completed.")

### D.  Discussion

Defendants argue that Plaintiff did not properly exhaust his available administrative remedies before filing his TAC.  *See* Defs.' P&As.  In support of their arguments, Defendants submit the declaration of E. Frijas ("Frijas Decl."), Appeals Coordinator RJD; declaration of H. Liu, ("Liu Decl.") Acting Chief for the Office of Appeals (OOA); and declaration of S. Gates ("Gates Decl."), Custodian of Records for California Correctional Health Care Services (CCHCS).  (*See* Doc. Nos. 42-1, 42-3, 42-5.)

### 1.  Claims against Valdovinos

In his TAC, Plaintiff alleges that on April 23, 2017, Valdovinos kneed him in the back of the head, forcing his face into the concrete floor, and knocking out four of his front teeth.  (*See* TAC at 5-6.) He further alleges that Valdovinos observed the actions of Cruz who excessively pepper-sprayed Hoyt and failed to intervene.  (*Id.* at 13.)

#### a.  Grievance Log No. RJD-C-17-02519

Plaintiff filed this grievance on May 16, 2017 which was given Log. No. RJD-C-17-02519.  (*See* Frijas Decl. at ¶ 6, Ex. 1 at 14.)  In this grievance, Plaintiff claimed Valdovinos forced Plaintiff to the ground by kneeing him in the back of the head, which resulted in his head slamming into the concrete and knocking out his four front teeth.  (*Id.*) Plaintiff alleges that Defendants Ramos and McGee told him that if he filed an excessive force claim against Valdovinos he would be put in ad seg and "8 cops would

infractions documented on CDC[R] Form 128-A (rev. 4-74), Custodial Counseling Chrono, pursuant to section 3312(a)(2), and shall exhaust administrative remedy on these matters." CAL. CODE REGS., tit. 15 § 3084.7(b)(1).

say that I attempted to assault a cop." (*Id*. at 16).  According to Plaintiff's grievance, he was placed in ad seg a few hours later for "battery on a peace officer." (*Id*.)  Plaintiff further asserts in the grievance that McGee coerced him into stating on video that Valdovinos fell on him accidentally.  (*Id*.) After the video, Plaintiff was released from ad seg, but he alleges that Defendant Godinez came to him with a message from Defendant Bracamonte who told him to "stick to my word: drop the excessive force claim." (*Id*.)

This grievance was bypassed at the First Level of appeal.  (Frijas Decl. ¶6(a)).  The appeal was "partially granted" at the Second Level of review on August 16, 2017, with a finding that staff did not violate CDCR policy with respect to one or more of the issues appealed.  (*Id.* at 11-12.)  Plaintiff was informed if he wished "to appeal the decision and/or exhaust administrative remedies, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's/Third Level of review. Once a decision has been rendered at the third Level, administrative remedies will be considered exhausted." (*Id*. at 13.)

Plaintiff did not send the grievance to the Third Level of appeal, but instead sent the grievance to the CDCR Office of the Ombudsman on September 15, 2017 (Frijas Decl. ¶ 7(a).)  The Ombudsman did not acknowledge receipt of the grievance until November 20, 2017, when she sent a letter informing Plaintiff that all appeals needed to be pursued through the Office of Appeals.  (*Id*. Ex. A at 16.) On December 19, 2017, Plaintiff submitted the grievance to the Office of Appeals through his attorney, Benjamin Rudin.  (*Id*. Ex A. at 9, 11.)  On January 19, 2018, the Office of Appeals cancelled the grievance as untimely because it was submitted more than 30 days after Plaintiff received the second level response.  (*Id*. Ex. A at 7.)  On March 8, 2018, the Office of Appeals received Appeal Log No. OOA-17-15808 (IAB No. 1802706) from Plaintiff relating to the cancellation of the Appeal Log No. RJD-17-02519.  The appeal was cancelled on January 19, 2018, as untimely. (*See* Dec. Liu Exhibit A at 7.) The OOA noted that although Plaintiff's Second Level response was returned to Plaintiff on August 23, 2017,

12

the Third Level submission was postmarked December 19, 2017, making it past time constraints. (*Id*.)  Plaintiff was instructed that he could appeal the cancellation and submit to the Third Level.

### b.  Grievance Log No. RJD-C-17-03132

Plaintiff filed this grievance on June 20, 2017 which was given Log. No. RJD-C-17-03132.  (*See* Frijas Decl. at ¶ 6, Ex. 2 at 23.)  Plaintiff filed an appeal regarding a property issue in which he alleged that the Housing Unit 15 floor Officers allowed inmates to roll up and dispose of Plaintiff's property without generating a Form 1083. *(See Id*.)   Plaintiff asserted that his property was stolen as a result. (*Id*. at 25.)  Plaintiff further asserted that Sgt. Diaz intentionally failed to respond to his Form 22's in retaliation for a staff complaint previously filed against Valdovinos.  The appeal was denied on July 31, 2017.  (*Id*. at 20.)

### c.  Grievance Log No. RJD-C-17-03396

Plaintiff filed this grievance on May 23, 2017 and it was given Log. No. RJD-C-17-03396.  (*See* Frijas Decl. at ¶ 7, Ex. 4.)  In this grievance, Plaintiff claims that Valdovinos assaulted him and caused serious bodily injury.  (*Id*.)

This grievance was cancelled on June 13, 2017 because it duplicated RJD-C-17-02519.  (*Id*. at 61).

### d.  Grievance Log No. RJD-C-17-05480

Plaintiff filed this grievance on August 17, 2017 and it was given Log No. RJD-C-17-05480.  (*See* Frijas Decl. at ¶ 7, Ex. 5 at 70.) In this grievance, Plaintiff alleged that Correctional Officers Valdovinos, Cruz, Miller, McWay and Lizzaraga, along with PT Edgar, Pt. Withers, Lt. Garcia, Sgt. Ramos, D. Hampton, RN Garcia and Warden Paramo falsified reports, failed to describe Plaintiff's injuries and any medical attention he received, failed to document steps taken to decontaminate the housing unit, failed to interview witnesses, all in a coordinated effort  to cover up Valdovinos' excessive force against Plaintiff. *(See* Frijas Decl. at ¶ 7, Ex 5 at 70-72.)   The appeal was cancelled on

September 19, 2017, because it allegedly duplicated Appeal Log RJD-C-17-02519.  (*Id*. at 69.)

### e.  Grievance Log No. RJD-C-17-03541

Plaintiff filed this grievance on May 30, 2017 and it was given Log. No. RJD-C-17-03541.  (*See* Frijas Decl. at ¶ 6, Ex. 3.)  In this grievance, Plaintiff claims that Defendant Cortez refused to grant him an extension of time to find and interview witnesses for a rules violation hearing, and obstructed access to witnesses in Building 14.  (*Id*.)

This grievance was partially granted on August 21, 2017, with a finding that Plaintiff was not given an opportunity to call witnesses at the hearing and he was not assigned an Investigative Employee (IE) to assist in gathering information pertinent to the disciplinary decision.  (See Frijas Dec. Ex 3 at 39-41.)   The rules violation was ordered to be reissued and a rehearing conducted after Plaintiff interviewed witnesses.  (*Id*. at 41.)  Plaintiff contends that the rehearing has never taken place.

### 2.  Claims against Cruz

In his TAC, Plaintiff alleges that on April 23, 2017, Cruz pepper-sprayed Plaintiff all over his head and back while he was lying prone, handcuffed and in leg restraints.  (*See* TAC at ¶79.)  Plaintiff further alleges that Cruz failed to stop Valdovinos' actions.  (*Id*. at ¶87.)

As noted above, Plaintiff filed a grievance on August 17, 2017 and it was given Log No. RJD-C-17-05480 in which he alleged that Cruz, among others, failed to follow procedures including falsification of records in an effort to cover up Valdovinos' actions.  (*See* Frijas Decl. at ¶ 7, Ex. 5 at 70-72.)  The grievance was screened and rejected as untimely and duplicative. (*Id*. at 69.)

### 3.  Claims against Ramos, McGee, and Godinez

In his TAC, Plaintiff alleges that Ramos and McGee failed to intervene and stop Valdovinos' excessive use of force.  (TAC at ¶ 84.)  Plaintiff further alleges that Ramos

and McGee attempted to deter Plaintiff from filing an excessive force complaint by threatening that they would get multiple officers to say Plaintiff attacked Valdovinos and put him in ad seg if he filed. Plaintiff further alleged that Ramos, McGee and Godinez threatened to retaliate against him if he did not drop his excessive force claim against Valdovinos once it was filed. (*Id*. at ¶¶ 95, 96, 100.)

As previously noted, Plaintiff filed a grievance on May 16, 2017 which was given Log. No. RJD-C-17-02519, in which he claimed Ramos, Godinez, and McGee threatened to retaliate and did retaliate against him for pursuing the excessive force complaint against Valdovinos. These acts of retaliation included threatening disciplinary action against him and losing his personal property. (*See* Frijas Dec. Ex 1 16.)  Although this appeal was partially granted at the second level of review, the authorities found no violation of CDCR policy. (*See* Frijas Dec. Ex. A at 12.)  Three months later Plaintiff submitted a Third Level Appeal which was screened as untimely.

Plaintiff included Ramos and McGee in appeal number RJD-C-17-05480 claiming they, along with other officials, violated rules related to handling the incident with Valdovinos including its investigation. (*See* Frijas Dec. Ex 5 at 70.) This appeal was screened as duplicative of Appeal Log RJD-C-17-02519.  (*Id.* at 69.)

### 4.  Claims against Defendant McWay

In his TAC, Plaintiff alleges that Defendant McWay failed to intervene to stop the alleged excessive force by Valdovinos.  (TAC ¶84.)

In grievance Log. No. RJD-C-17-03396, Plaintiff stated that he wanted to file charges against McWay, and Valdovinos, for assault, claiming that he asked Defendant McWay to inform Valdovinos and others that he was permitted to be in the yard, but McWay refused.  (*See* Frijas Decl. at ¶ 7, Ex. 4 at 64- 66.) As previously noted, this grievance was cancelled on June 13, 2017 because it duplicated RJD-C-17-02519.  (*Id*. at 61.)

In appeal RJD-C-17-05480, Plaintiff stated that McWay failed to properly

document the use of force by Valdovinos.  (*See* Frijas Dec. Ex 5 at 70-72.)  This appeal was screened out as duplicative of Appeal Log RJD-C-17-02519.  (*Id.* at 69.)

### 5.  Claims against Defendant Cortez

In his TAC, Plaintiff alleges that Cortez retaliated against him for filing the excessive force complaint against Valdovinos by refusing to allow him to call witnesses at his hearing on a rule violation. (TAC ¶98.)

On August 21, 2017, the grievance was partially granted, as previously indicated, and the rules violation was ordered to be reissued and a rehearing conducted after Plaintiff interviewed witnesses with the assistance of an Investigative Employee. Plaintiff contends that the rehearing has never taken place.

### 6.  Claims of Failure to Intervene against Defendants Miller, Lizarraga, PT Elgar and PT Withers

In Plaintiff's TAC he alleges that Defendants Miller, Lizarraga, Elgar, and Withers failed to intervene to stop the alleged use of excessive force by Defendant Valdovinos. (TAC ¶¶ 84, 88).

Plaintiff asserted claims against these Defendants in his grievance filed on August 17, 2017, Log No. RJD-C-17-05480, claiming the Defendants and others, violated various procedures, including falsification of records in an effort to cover up Valdovinos' actions.  (*See* Frijas Decl. at ¶ 7, Ex. 5 at 70-72.) As noted previously, this grievance was screened and rejected as untimely and duplicative of grievance RJD-C-17-2519. (*Id.* at 69.)

### 7.  Claims of Deliberate Medical Indifference against Dr. Frandsal

In the TAC, Plaintiff asserted that Dr. Frandsal was deliberately indifferent to his pain and medical needs when she ordered he not be seen until the following day. (TAC ¶ 105.)  Plaintiff did not mention Defendant Frandsal in any of the appeals regarding the excessive force claim, only asserting that he was not provided medical attention for over five hours in the first appeal.  (Frijas Dec. Ex 1 at 14.)

### 8.  Claims against Warden Paramo

In his TAC, Plaintiff alleges that Defendant Paramo failed to properly supervise Defendant Valdovinos despite knowing Valdovinos had a propensity to use excessive force while acting under color of law.  (TAC ¶¶112-114.)  Plaintiff did not include Defendant Paramo in any appeal until his August 17, 2017 filing, in which he asserted that Defendant Paramo, along with others, failed to follow procedures and properly file reports related to the incident with Defendant Valdovinos.  (*See* Frijas Dec. Ex 5 at 70-72.) This appeal was cancelled as duplicative of his grievance in RJD-C-17-02519.

### 9.  Claims against Olivarria, Self, and Hunnicut

In the TAC, Plaintiff asserts that Correctional Counselors Olivarria, Self, and Hunnicut violated his First Amendment rights by retaliating against him for filing the excessive force complaint and delayed a decision on it.  (TAC ¶ 99.)  It does not appear from the records that Plaintiff included Defendants Olivarria, Self, and Hunnicut in any of the grievances or appeals he filed.

### 10. Claims against Covel, Beyer, and Rico

In his TAC, Plaintiff alleges that Correctional Administrator Carie Covel failed to properly investigate his claims and actively helped to cover up the incident and retaliatory actions taken against Plaintiff.  (TAC ¶85.)  Plaintiff alleges that Dr. Beyer failed to investigate or report Plaintiff's complaints to Dr. Adibe about being the object of retaliation by Valdovinos and Ramos. He further alleges that Dr. Beyer ordered Dr. Adibe to stop informing her of the complaints and not file reports related to the complaints.  (*Id.* at ¶ 88.)  Plaintiff alleges that Sgt. Rico retaliated against him for filing his excessive-force complaint, violated CDCR procedures and refused to let Plaintiff call witnesses, omitted the witnesses from his requested witness list, and refused to interview witnesses in support of his rules violation report hearing.  (*Id.* ¶97.)

Plaintiff did not include these Defendants in any of the appeals filed with the

appeals office.

**11. Analysis**

As noted above, "the [D]efendant[s]' burden is to prove that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino*, 747 F.3d at 1172. The burden then shifts to Plaintiff "who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him." *Williams*, 775 F.3d at 1191; *Albino*, 747 F.3d at 1172; *Jones*, 549 U.S. at 218. He may do so by "showing the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Albino*, 747 F.3d at 1172 (citation omitted); *see also Ngo v. Woodford*, 539 F.3d 1108, 1110 (9th Cir. 2008) (noting potential "unavailability" of administrative remedies if officials "obstruct[ed] [the prisoner's] attempt to exhaust," or "prevented [him] from exhausting because procedures for processing grievances weren't followed."). "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross,* 136 S. Ct. at 1858.

The Court finds that the evidence presented by Defendants attached to their sworn declarations "meets [Defendants'] burden of demonstrating a system of available administrative remedies at the initial step of the *Albino* burden-shifting inquiry." *Williams*, 775 F.3d at 1192. The burden shifts back to Plaintiff to demonstrate administrative remedies were effectively unavailable to him. It is not disputed that Plaintiff Hoyt failed to timely file an appeal to the Third Level against Defendant Valdovinos and other Defendants, however, Hoyt alleges that numerous factors made administrative remedies unavailable to him including threats of retaliation for filing an excessive force complaint, actual retaliation, staff failure to follow procedures, misleading instructions about filing appeals, and failure to report retaliation to proper authorities. Specifically, Hoyt claims that there are disputed facts about his failure to

exhaust including whether he mailed his final appeal of the cancellation of his 602, whether he was misled with regard to sending the appeal to the Ombudsman instead of the Third Level of review, whether evidence was tainted at the outset when he was coerced into stating on camera that Valdovinos' actions were an accident, and whether the investigating officer refused to take the names of witnesses Plaintiff needed to interview in support of his claim.  (Mem. Oppo. 6-7)

According to Plaintiff, the intimidation began when Defendants Ramos and McGee threatened to have multiple officers say that Plaintiff assaulted Valdovinos if he filed the excessive force complaint, threatened to file a report against Hoyt, and threatened to place him in ad seg if he filed the excessive force complaint.  (TAC ¶¶ 95, 96.)  Indeed, Defendants filed a "Battery on a Peace Officer" violation against Plaintiff after Plaintiff requested a video interview in support of his excessive force claim, and he was placed in ad seg, demonstrating that Defendants would carry out their threats. (Dec. Frijas Ex 5 at 95; Mem. Oppo Ex A. at 6 [49-2].)  The day after Plaintiff stated on video that Valdovinos knocked out his teeth by accident, the "Battery on a Peace Officer" charge was dropped.  (TAC ¶¶ 53, 54.)

Although Plaintiff attempted to report the threats and retaliation through the proper channels, informing his psychologist Dr. Adibe each time they occurred, Hoyt contends that Dr. Adibe's supervisor, Dr. Beyer, told her to stop reporting the complaints. (TAC ¶¶ 61, 62.)  If true, a jury could draw the reasonable inference that the effect was to muzzle Hoyt and cast doubt upon his ability to successfully maneuver through the administrative grievance process.

Hoyt was familiar with the requirement to file all appeals to the Third Level and successfully did so on numerous prior occasions. Between 2006 and 2012 Plaintiff submitted and exhausted seven appeals to the Office of Appeals, demonstrating his understanding about the necessity of exhausting grievances to the Third Level of appeal. (*See* Dec. Liu ¶9.) However, in this case he sent the Third Level appeal to the

Ombudsman as he asserts he was instructed to do if he felt there was a concern with the appeals process. Evidently something was different during this appeals process because rather than submitting his appeal directly to the Third Level, as he had done in a timely manner many times before, he sent it to the office of the Ombudsman as he alleges he was directed to do if there was a concern about the administration of the appeal for help in ensuring it was delivered. In his appeal dated March 2, 2018, he stated,

> Due to my inability to obtain a 602-A form (see attached 22), I am appealing the cancellation because I was instructed by the ombudsman at RJD and MCSP to send the appeal to them if RJD failed to adhere to my appeal rights and the procedures set forth in CCR and DOU. As is evidenced by the attached letter to Tami Falconer [sp], Ombudsman, I sent the appeal (#RJD-C-17-02519) to her on 9-15-17 with a letter illustrating the many violations RJD committed in processing the 2nd level and asking her to forward the appeal to the chief of the I/M appeals. Instead, she took 2 months to send it back to me, making it impossible for me to send it in on time. So I sent it to my attorney to make a copy of and instructed him to forward it to you. The DOU allows for a reviewer to accept late appeals if the appellant has good reasons for being tardy. I have made every good effort to file this appeal at every level on time and according to regulations, in spite of the fact that CDCR personnel have gone out of their way to violate my appeal rights…

(Dec. Liu Ex B 21-23.)

The Ombudsman did not send it along to the appropriate office for review, instead returning it to Hoyt months later resulting in the appeal being untimely when Hoyt asked his lawyer to file it. In light of his demonstrated familiarity and understanding of the appeals process, the Court concludes that a jury could draw the reasonable inference that Hoyt sent the appeal to the Ombudsman only because he was encouraged and instructed to do so if there was a problem with the second level appeal process.

Viewing the evidence in the light most favorable to Defendant, the combined effect of the threats, retaliation, instructions to inform the Ombudsman, and RJD staff's failure to follow procedures, Plaintiff has raised a genuine issue of material fact whether administrative remedies were available for purposes of appeal RJD-C-2519 concerning

Valdovinos, McGee, Ramos, Bracamonte, and Godinez.  RJD officials "thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations, … in [his] individual case." *Ross*, 136 S. Ct. at 1862.

As to Defendant Cortez, Plaintiff's claims were administratively exhausted when grievance number RJD-C-17-03541 was partially granted on August 21, 2017, with a finding that Plaintiff was not given an opportunity to call witnesses at the hearing and he was not assigned an Investigative Employee (IE) to assist in gathering information pertinent to the disciplinary decision.  (See Frijas Dec. Ex 3 at 39-41.)  A plaintiff may "initiate litigation in federal court only after the administrative process ends and leaves his grievances unredressed."  *Vaden v. Summerhill,* 449 F.3d 1047, 1051 (9th Cir. 2006). Plaintiff did his part to exhaust this claim, despite the fact that the prison officials failed to complete the process and rehear the grievance.

As to the remaining claims against other Defendants, the Court finds that Plaintiff did not exhaust his administrative remedies as follows.

With regard to allegations of excessive force and failure to intervene against Defendant Cruz, Plaintiff did not include these allegations in his first grievance RJD-C-17-02519, but instead raised them in his grievance No. RJD-C-17-05480 filed on August 17, 2017 in which he alleged that Cruz, among others, failed to follow procedures and falsified records in an effort to cover up Valdovinos' actions. (*See* Frijas Decl. at ¶ 7, Ex. 5 at 70-72.)  However, this grievance was screened and rejected as untimely and duplicative, therefore the claims were not administratively exhausted. (*Id*. at 69.)

The claims against Defendants Miller, Lizarraga, Elgar and Withers were not administratively exhausted with regard to allegations that they failed to intervene to stop the excessive force by Defendant Valdovinos.  Plaintiff did not assert these claims in his initial complaint against Valdovinos.  In appeal number RJD-C-17-05480, Plaintiff raised claims against these Defendants alleging they failed to follow procedures, but did not claim they failed to intervene.  The appeal was screened and rejected as untimely,

therefore, Plaintiff failed to exhaust administrative remedies as to Defendants Miller, Lizarraga, Elgar, and Withers.

Plaintiff did not administratively exhaust his claim of deliberate medical indifference against Dr. Frandsal because he did not mention Defendant Frandsal in any of the appeals regarding the excessive force claim, but only asserted that he was not provided medical attention for over five hours in the first appeal. (Frijas Dec. Ex 1 at 14.) Similarly, Plaintiff did not administratively exhaust his claims against Correctional Counselors Olivarria, Self, and Hunnicut because he did not include these Defendants in any of the grievances or appeals he filed. In addition, Plaintiffs claims against Defendants Covel, Beyer, Rico, were not administratively exhausted because there is no evidence he named these Defendants or described them and their actions in any of his appeals, cancelled or otherwise.

Plaintiff did not exhaust administrative remedies regarding his claim that Defendant Paramo failed to properly supervise Valdovinos because his August 17, 2017 filing, in which he asserted that Defendant Paramo, along with others, failed to follow procedures and properly file reports related to the incident with Defendant Valdovinos, was cancelled as duplicative of RJD-C-17-02519. (*See* Frijas Dec. Ex 5 at 70-72.)

Although Plaintiff asserts that he did not have enough room to describe each of the above defendants along with their actions in the limited space provided on form 602 in his initial grievance, he successfully exhausted multiple grievances prior to the filing of his excessive force grievance, therefore he was aware that he had to include a description of the defendants and their actions to exhaust claims against them.

Thus, for the reasons set forth above, the Court DENIES in part and GRANTS Defendants' Motion for Summary Judgment.

//

//

//

22

**III.    Conclusion and Order**

Accordingly, the Court:

**DENIES** Defendant's Motion for Summary Judgment as to Defendants Valdovinos, McGee, Ramos, Bracamonte, and Godinez;

**DENIES** Defendant's Motion for Summary Judgment as to Defendant Cortez; and

**GRANTS** Defendants' Motion for Summary Judgment pursuant to 42 U.S.C. § 1997e(a) (ECF No. 33) as to all remaining Defendants.

**IT IS SO ORDERED**.

Dated: September 3, 2020

Hon. M. James Lorenz
United States District Judge

23